855 So.2d 861 (2003)
STATE of Louisiana, Appellee,
v.
Charles R. GEORGE, Appellant.
No. 37,492-KA.
Court of Appeals of Louisiana, Second Circuit.
September 24, 2003.
*864 Kenota P. Johnson, Louisiana Appellate Project, for Appellant.
Jerry Jones, District Attorney, Stephen Sylvester Assistant District Attorney, for Appellee.
*865 Before BROWN, WILLIAMS, and DREW, JJ.
BROWN, C.J.,
Defendant, Charles Richard George, was convicted by a unanimous jury of aggravated kidnaping on September 20, 2002, and was sentenced to life imprisonment at hard labor without benefit. Defendant appeals his conviction. Finding no error, however, we affirm.

Facts
On May 11, 2001, the West Monroe Police Department received a telephone call from the owner of a realty company who was concerned because one of his agents, Dondi Kay Copeland, was late for desk duty and had not been seen or heard from in several hours. Co-workers and Christopher Copeland, Dondi's husband, were at the realty office trying to determine where she might be.
When an investigating officer arrived at the realty company office, he learned that Chris had been able to find out from his father, who worked for CenturyTel, that Dondi's cell phone was being used in Chatham, which is in Caldwell Parish, Louisiana. The officer called the Caldwell Parish Sheriff's Office and gave a description of the 29-year-old woman and her car, a white Toyota Solara with Alabama license plates. The Caldwell Parish deputy reported that their office was investigating the death of a woman meeting the description given by the West Monroe officer and noted that a white Toyota Solara was involved in the investigation.
The Caldwell Parish Sheriff's Office had received a telephone call around 1:00 p.m. from a motorist who reported that she had seen an object that looked like a mannequin bounce on the highway as she drove past a white car traveling very close behind a log truck. As the motorist turned her vehicle around to go back to see what had happened, the white car turned down a side road. The object in the road turned out to be the body of a white female who was bleeding profusely from the head.
During the course of the investigation, it was determined that Mrs. Copeland had left the realty office earlier that morning with a client who said that he had $40,000 to spend on property. They left in Mrs. Copeland's car and several people reported seeing them together before noon looking at rural residences.
The Caldwell Parish Sheriff's Office began to search for the suspect, who was described by an employee of the realty company as a slender white male, between 5'8" and 6'0" tall, with long sandy brown hair and bad teeth. The deputies searched the woods near the road where the victim's car had been found abandoned.
The next day, defendant, Charles Richard George, Sr., who had spent the night in the woods, turned himself in to an off-duty deputy. The state police were notified and defendant was questioned in a videotaped interview. Four officers were in the room during the interrogation that began by defendant being advised of and signing a written waiver of his Miranda rights.
During this interview, defendant related that he had parked his truck in the Glenwood Medical Center parking lot and walked to the realty office to meet Mrs. Copeland. She drove him to several locations to show him rural properties. When they were done, Mrs. Copeland took defendant back to his truck. Defendant said that he told Mrs. Copeland that he needed some money and she laughed, saying that she did not have any money.
Defendant stated that he then made Mrs. Copeland drive him out of town. He took her to a camp owned by his brother, ordered her into the house and told her to *866 take off her clothes. Defendant attempted to rape Mrs. Copeland, but ejaculated prematurely on her leg. When they left, defendant made her get into the trunk of the car. While he was driving down the highway back toward Ouachita Parish, Mrs. Copeland opened the trunk and either fell or jumped out of the vehicle. She died as a result of injuries to her head caused when she hit the pavement.
After the video camera was turned off, the officers took an inventory of defendant's belongings and noticed that he had $200 in twenty dollar bills. Defendant told the officers that it was money that he had gotten from Mrs. Copeland. The videotape was turned back on and defendant related how he had asked the victim for the money and she had laughed, saying that she did not have any money. Defendant said that he then grabbed her wrist and told her that he was serious. Defendant stated that he scared her and told her to drive. Mrs. Copeland then asked him how much money he wanted and he replied $150-$200. She said that she would try to get him money out of a bank account but that she was unsure how much money she would be able to get. Defendant said that Mrs. Copeland then drove to an ATM and withdrew $200. Defendant held her by the wrist while she got out of the car to get the money from the ATM machine. Defendant reiterated how he then made her drive out of the parish and to the camp where he attempted to have sex with her.
Defendant was charged by a Ouachita Parish grand jury with aggravated kidnaping. Among the various motions filed by the defense were a motion to suppress the confession, a motion in limine and a motion to change venue. All of the motions were denied by the trial court. A 12-person jury found defendant guilty as charged on September 20, 2002, and he was sentenced to life imprisonment at hard labor without benefit. Defendant has appealed his conviction.

Discussion

Sufficiency of the Evidence/Denial of Motion for Post-Verdict Judgment of Acquittal
Defendant contends that there is insufficient evidence to convict him of aggravated kidnaping because there is no proof that the victim was forced to be with him or that she was made to give up anything of value. Defendant's argument is based upon the statements of the three people who saw Mrs. Copeland and defendant together during the day while they were out looking at property, which testimony was that the victim did not appear to be afraid of defendant. Defendant further argues that it is unclear whether the victim voluntarily or involuntarily transferred money to him. Finally, defendant asserts that there is no evidence to show that the victim was deprived of anything in exchange for her release or promise of her release.
This court's first step in reviewing the sufficiency of the evidence is to determine whether the accused is entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). An acquittal should be granted if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29, 253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This court's authority to review questions of fact in a criminal case is limited *867 to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Withers, 36,001 (La.App.2d Cir.06/12/02), 821 So.2d 556; State v. Williams, 448 So.2d 753 (La. App. 2d Cir.1984). A reviewing court must defer to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
La. R.S. 14:44 provides in pertinent part:
Aggravated kidnaping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
To sustain a conviction for aggravated kidnapping the state had to prove: (1) forcible seizing; (2) carrying of any person from one place to another; (3) intent to force the victim, or some other person, to give up anything of apparent present or prospective value; (4) in order to secure the release of that person. State v. Arnold, 548 So.2d 920 (La.1989).
Defendant's own statement, corroborated by other evidence, supplies proof of the elements necessary to convict. The pertinent parts of defendant's confession, reproduced here as written and without references to grammatical and syntax errors to allow for easier reading, are:
And that's when I asked her if she had any money. She said "what." And I said have you got any money and I said I'm serious. And she said no. She said I broke. And I said, okay that's when I grabbed her wrist. That's when I did it....
I just pinned her wrist like on the uh... the floor shift ... the floor gear. Cause she had put it in park and I reached over and I grabbed it. And just like I told him I grabbed it harder than I meant too. And I guess that's what part of what scared her. Was that I did it so fast and so hard.
This action described by defendant, his grabbing of Mrs. Copeland's wrist, constitutes the first element, a forcible seizing.
Continuing his description, defendant stated:
And uh ... she said what do you want me to do. And I said drive. You know. She said which way. I said down Jonesboro Highway.
By commanding the victim to drive, defendant forced her to be carried from one place to another at his direction, thus satisfying the proof requirement for element two, the carrying of a person from one place to another. At this point in time, defendant and Mrs. Copeland had completed looking at real estate properties and she had already driven him to the Glenwood Medical Center parking lot to pick up his truck (although he refused to get out of her vehicle at that time). The witnesses' testimony that the victim did not appear to be under stress or was not with defendant against her will was clearly about the time frame before he grabbed her wrist and forced her to continue driving him around.
*868 The third element, the intent to force the victim, or some other person, to give up anything of apparent present or prospective value, was met when the following colloquy took place between Mrs. Copeland and defendant:
And she said uh ... how much money do you need. And I said $150/$200. And she said well I got a credit card. She said I don't know if it will go through but she said, "I'll try it." If you want to. And I said okay.
Continuing with his confession, defendant stated that when they got to the bank, she used the ATM:
I still had my hand on her wrist and uh... she took a card and reached over and put it in there or whatever she had to do. But she said that she couldn't reach something and I said that you're not going to get out. Cause she opened the door....
I said that you are not going to get out. She said, "I'm not. I promise." And I held her wrist by ... I let her get out a little bit so she did what she gonna do....
She punched in what she had to punch in. And it came up okay. IT was approved and she said Thank God. And she got it. She shut the door and got back in ...
From the above description, Mrs. Copeland's reaction to receipt of the money from the ATM was one of thankfulness and apparent relief. Defendant admitted in his statement that the victim was shaking or trembling right after he grabbed her, that she asked him not to hurt her and that she started praying.
Unfortunately, defendant did not release Mrs. Copeland at that point. The evidence shows that he ordered her to drive out of the parish to a family camp in Caldwell Parish where he attempted to rape her and committed sexual battery. Defendant did not release the victim at that time, either. Instead, he forced her into the trunk of her car. Mrs. Copeland died as a result of head injuries she sustained while attempting to escape. This court, however, has not examined the record in its sufficiency of the evidence analysis on anything past what took place at the ATM. The state intentionally limited its case, inasmuch as prosecution of the subsequent sexual offense(s) and homicide could be/have been instituted in Caldwell Parish.
This is clearly sufficient to satisfy the last element, that the thing of value be required for the release of the person taken. As noted by the court in State v. Arnold, supra at 925:
Thus, the crucial question in determining whether an aggravated kidnaping has occurred is not whether the defendant had intent to release the victim at either the outset of the crime or indeed at any point during the crime. The more important question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim's fear and hope of eventual release in order to gain compliance with his demands.
Defendant forced Mrs. Copeland to do things against her interest. He made her drive him from the Glenwood Medical Center parking lot and demanded money from her. It was reasonable for the jury to have found that the victim cooperated with defendant in hopes of getting released. Further, it was reasonable for the jury to have concluded that all of the elements of the offense of aggravated kidnaping were proved beyond a reasonable doubt. Defendant's own statement was the best proof of the events that took *869 place and what the victim said and did in response to his demands.
This assignment is without merit.
Denial of Motion to Change Venue
Defendant asserts that the jury was tainted by the media sensationalism surrounding the case and that the trial court erred in denying his motion for a change of venue.
A defendant is guaranteed an impartial jury and a fair trial. La. Const. art. 1, § 16; State v. Brown, 496 So.2d 261 (La.1986). To accomplish this end, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Clark, 02-1463 (La.06/27/03), 851 So.2d 1055; State v. Frank, 99-0553 (La.01/17/01), 803 So.2d 1; State v. Bell, 315 So.2d 307 (La.1975), appeal after remand, 346 So.2d 1090 (La.1977).
Changes of venue are governed by La. C. Cr. P. art. 622, which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
The following are relevant factors to be considered when determining whether to grant a change of venue under article 622:
(1) the nature of pre-trial publicity and the particular degree to which it has circulated in the community;
(2) the connection of government officials with the release of the publicity;
(3) the length of time between the dissemination of the publicity and the trial;
(4) the severity and notoriety of the offense;
(5) the area from which the jury is to be drawn;
(6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and
(7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
State v. Frank, supra; State v. Bell, supra.
Defendant has the burden of showing that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Clark, supra; State v. Frank, supra; State v. Vaccaro, 411 So.2d 415 (La.1982). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. Id.
The defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial. State v. Clark, supra; State v. Frank, supra; State v. Wessinger, 98-1234 (La.05/28/99), 736 So.2d 162. A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime. State v. *870 Clark, supra; State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
On review of denial of a change of venue, courts will primarily inquire as to the scope and nature of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial, in order to ascertain whether prejudice existed in the mind of the public which prevented the defendant from receiving a fair trial. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); State v. Clark, supra; State v. Hoffman, 98-3118 (La.04/11/00), 768 So.2d 542, cert. denied 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). Additionally, courts have examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind. Murphy v. Florida, supra; State v. Clark, supra; State v. Wessinger, supra.
In this case, the publicity complained of consisted of area newspaper articles and television news broadcasts. The defense presented evidence that news surrounding the discovery of the victim's body, defendant's arrest and his appearances at subsequent hearings was front page news four times. The television station only kept its log for one year, but its records showed that defendant's trial was the lead story on the evening news two times. News surrounding the case also ran on at least three other days, airing during three broadcasts on each of those days. Testimony established that these news items were put before the public from the day Dondi Copeland's body was found in June 2001 until the motion to change venue was considered in July 2002.
There was no evidence that anyone, particularly the state, had encouraged any media publicity about the case. There was, however, testimony that this case had in fact been downplayed because a member of the victim's family used to work at the local television station. The trial judge decided to defer his decision until the trial date and ruled that a venire of 200 persons instead of the usual 150 persons would be called. The judge also stated that individual voir dire would be conducted if it were deemed necessary.
At the onset of the selection process, the trial judge was very thorough in ensuring that an impartial jury was selected. The court ordered that only small panels be brought in at a time. The judge began by asking for a show of hands of the people who subscribed to the local newspaper, read the newspaper daily or watched the evening news. He then narrowed the questioning down to ask the potential jurors who among them recalled reading or seeing anything about the case in the media. In the first panel of 12, only four persons responded that they could recall the case. Of those, only one stated that she had formed an opinion about what had happened in the case. She was excused from the panel for cause by the trial court. The other persons were questioned by the state's attorney and defense counsel and, based upon their responses, neither side asked for any of them to be removed from the jury.
Panel number two, made up of 14 people, had several persons who had heard about the case in the news and one person who knew the victim's family. Individual questioning resulted in three people being dismissed for cause based upon their statements that they had already made up their minds and could not decide the case solely based upon the evidence presented. The third panel also contained 14 persons. *871 Several people on this panel had read or heard the news. Four persons from this panel were released because they related that they had already formed an opinion about defendant's culpability.
Of the 40 persons questioned during voir dire, a total of 27 were excused. Of this number, only eight were excused because of the pre-trial publicity and its taint. This number is not so high or outrageous as to justify any presumption of community-wide prejudice. Additionally, there was no evidence presented to show that the pre-trial publicity was particularly inflammatory in nature or that the government officials had taken any action to gain an advantage through the media.
The trial court participated in the intensive questioning of the venire on the pre-trial publicity and what the potential jurors had seen, heard or read. The court excused for cause all of the potential panel members who indicated that they had already formed an opinion. The record shows that only a few of the jurors either saw or could recall the media coverage of the case or knew either defendant or the victim. A careful review of the prospective jurors' responses shows that the prerequisite prejudice did not exist in the community.
On this record, we cannot say that the trial court abused its discretion in denying defendant's motion for a change of venue. This assignment of error is without merit.
Denial of Motion to Suppress
Defendant asserts that the statement he gave in which he incriminated himself was involuntary and coerced due to his extreme mental and physical exhaustion and fatigue.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977), appeal after remand, 377 So.2d 1218 (La.1979); State v. Loyd, 35,637 (La. App.2d Cir.02/27/02), 810 So.2d 1214, writ denied, 02-1159 (La.04/21/03), 841 So.2d 779; State v. Roddy, 33,112 (La.App.2d Cir.04/07/00), 756 So.2d 1272, writ denied, 00-1427 (La.05/11/01), 791 So.2d 1288; State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985).
Before a confession can be introduced into evidence, the state must affirmatively prove that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. Id.; State v. Walker, 28,577 (La. App.2d Cir.10/04/96), 681 So.2d 1023.
As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); State v. Morvant, 384 So.2d 765 (La.1980); State v. Jackson, 381 So.2d 485 (La.1980); State v. Roddy, supra.
Emotional distress on the part of a defendant is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so. State v. Moseley, 587 So.2d 46 (La.App. 2d Cir.1991), writ denied, 589 So.2d 1066 (La.1991); State v. McKnight, 539 So.2d 952 (La.App. 2d Cir. 1989), writ denied, 548 So.2d 322 (La. 1989); State v. Wiley, 513 So.2d 849 (La. App. 2d Cir.1987), writ denied, 522 So.2d 1092 (La.1988). Likewise, notwithstanding the fact that a defendant is suffering from *872 physical harm or claims that his mental capacity was impaired because of his physical condition at the time of his interrogation, his confession is nonetheless admissible unless he demonstrates that he was impaired to such a degree as to negate his comprehension and to render him unconscious of the consequences of what he was saying. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Hahn, 526 So.2d 260 (La.App. 2d Cir. 1988), writ denied, 532 So.2d 150 (La. 1988); State v. Guidry, 94-678 (La.App. 3d Cir.12/07/94), 647 So.2d 502.
The admissibility of a confession is a question for the trial court. State v. Franklin, 35,268 (La.App.2d Cir.12/19/01), 803 So.2d 1057, writ denied, 02-0352 (La.02/07/03), 836 So.2d 85; State v. Roddy, supra. When determining admissibility, the trial court's conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Loyd, supra. Great weight is placed upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Franklin, supra; State v. Crews, 28,153 (La.App.2d Cir.05/08/96), 674 So.2d 1082.
The saying that a picture is worth a thousand words applies to this case. As did the trial court, we have reviewed defendant's videotaped confession in light of his claims that the statement should have been suppressed because he was hungry, thirsty and exhausted when he was questioned. According to defendant, these facts, as well as the "persistent and repeated interrogations by numerous skillful law enforcement officers" undermined the voluntariness of his statement.
The tapes show that during the questioning, defendant was not handcuffed. Defendant's only complaint throughout the lengthy interview was that his feet were sore from wearing boots for so long. He asked for some water and one of the officers brought him a cup as soon as he requested it. Although defendant said that he had been in the woods for about a day and a half prior to the interview, he mentioned that he had slept some while in the woods. He also stated that he was able to hide from the people who were hunting him with dogs, although he did get shot at once.
Defendant, after giving several conflicting versions of the series of events, recalled minute details and gave what appears to be a logical, sequential recount of his actions. Although at times he cried and held his head in his hands, he did not mumble, hesitate or show any other signs of possible fatigue or confusion during the interview. A striking illustration of defendant's mental alertness is when he responded to one of the officer's accusations. During the interrogation, the officer accused defendant of planning all along to rape Mrs. Copeland; defendant reacted and emphatically stated that this was not true. Defendant seemed coherent and showed several other emotions, particularly sadness when he learned that Mrs. Copeland was dead and when he considered the impact his actions would have on his family.
In its ruling, the trial court indicated that it considered defendant's personal appearance as a factor in its decision, commenting on the physical appearance of defendant, particularly how his hair looked. Admitted into evidence as exhibit D-3 was a videotape of a news film clip taped at a later date. While the trial court did not have this film footage when it *873 made its decision to allow the videotaped confession into evidence, this court is allowed to consider all evidence in the record to make its decision. State v. Allen, 95-1754 (La.09/05/96), 682 So.2d 713; State v. Merchant, 490 So.2d 336 (La.App. 1st Cir.1986), writ denied, 496 So.2d 326 (La. 1986). A comparison of the two film clips shows that defendant's physical appearance on the night that he was questioned does not differ much from how he looked later at his court appearance.
The defendant in State v. Miller, 36,003 (La.App.2d Cir.07/25/02), 824 So.2d 1208, writ denied, 02-2480 (La.06/27/03), 847 So.2d 1253, claimed that the trial court erred in failing to suppress his statement, urging that his confession was involuntary because he had only ten minutes of sleep before his arrest, suffered from high blood pressure and had a headache at the time of the questioning. Defendant also asserted that he was required to strip naked and surrender his clothing as potential evidence before he was interrogated. On the other hand, the officers testified that they had read defendant his rights and he indicated that he understood them before waiving them. The officers further testified that defendant did not appear unable to give a statement.
In affirming the trial court's ruling, this court stated:
A trial court's findings following a free and voluntary hearing are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.06/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir. 1991), writ denied, 584 So.2d 1172 (La. 1991). Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.1991), writ denied, 586 So.2d 545 (La.1991). Police testimony may overcome a defendant's claim that his statement was involuntary because he suffered from a wound or lack of sleep. State v. Billiot, 94-2419 (La.App. 1st Cir.04/04/96), 672 So.2d 361, writ denied, 96-1149 (La.10/11/96), 680 So.2d 655.
State v. Miller, 824 So.2d at 1217.
In the instant case, two officers testified that defendant indicated that he understood his rights prior to waiving them in writing. They further stated that they neither offered defendant any inducements or made promises nor coerced or threatened him. One of the detectives also stated that defendant never requested any medical attention.
In this case, as in State v. Miller, supra, the police testimony (as well as the videotaped confession itself) rebutted defendant's claims that his condition at the time of the questioning undermined the voluntariness of his statement. The trial court's conclusion that defendant's statement was freely and voluntarily given is fully supported by the evidence.
This assignment of error is without merit.
Denial of Motion in Limine
According to defendant, the trial court erred in denying his motion in limine to exclude evidence of other crimes. Defendant argues that the facts surrounding the other alleged crimes, the sexual assault and death of Mrs. Copeland, are separate, distinct and unrelated to the aggravated kidnaping charge. In the alternative, defendant contends that the evidence should have been excluded because of the unfair prejudice it had the potential to create.
Defendant properly raised the objection to the introduction of evidence of the other crimes evidence in a motion in limine. Inasmuch as the alleged irregularity *874 or error was objected to at trial level, this issue can be considered on appeal. La. C. Cr. P. art. 841; State v. Bosley, supra.
As set forth in La. C.E. art. 404(B)(1), though generally inadmissible, evidence of other crimes, wrongs or acts may be introduced when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. State v. Lincoln, 34,770 (La.App.2d Cir.06/22/01), 794 So.2d 56; State v. Coates, 27,287 (La.App.2d Cir.09/27/95), 661 So.2d 571, writ denied, 95 2613 (La.02/28/96), 668 So.2d 365. In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving the immediate context of happenings near in time and place. State v. Colomb, 98-2813 (La.10/01/99), 747 So.2d 1074; State v. Lincoln, supra. The test of integral act evidence simply is not whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to draw the inferences, whatever they may be, necessary to reach an honest verdict. State v. Colomb, supra, quoting from Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).
In the instant case, the evidence of other crimes committed by defendant, the sexual assault and death of Mrs. Copeland, was admissible because these acts formed an integral part of the act or transaction that is the subject of the present proceeding, inasmuch as they were acts of defendant immediately following his forcible taking of the victim and her forced withdrawal of funds from the ATM. Defendant kidnaped Mrs. Copeland and demanded money. Instead of releasing the victim after he got cash from her, defendant forced her to drive to another parish, where he attempted to rape her, then put her in the trunk of her own car. Mrs. Copeland died as a result of injuries she sustained while attempting to escape from defendant. Clearly these events constituted one continuing transaction.
Presentation of the facts of the kidnaping alone would have been incomplete, particularly in light of the fact that the jury would have wondered where the victim was and why she was not testifying about the kidnaping. The investigation into Mrs. Copeland's disappearance began in Ouachita Parish at the request of her employer, who was trying to find his missing employee. During the course of this investigation, Ouachita Parish authorities contacted the Caldwell Parish Sheriff's Office, which happened to be investigating the death of the person that Ouachita Parish was looking for. Clearly, exclusion of this evidence would have resulted in the state's inability to present the jury with all of the pertinent facts surrounding the instant offense.
We find no abuse of the trial court's discretion in its ruling on defendant's motion in limine.
This assignment of error is without merit.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.