BROWN, Chief Judge.
_jjA jury convicted, defendant, Barry McCray, of second degree murder and ag *993 gravated kidnapping. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension, for each count, to be served consecutively with one another. Defendant has appealed. We affirm.

Facts

On April 21, 2005, Shonda Proctor McCray was found dead in her home. She had severe bruising around her face and upper body. Earlier that evening, the victim, her husband (Barry McCray), and the victim’s then nine-year-old daughter were at home. The child testified that they were watching television when her mother answered the telephone and then gave the following account of the sequence of events. Defendant got mad because he thought she was talking to a man and began throwing objects to the floor and tearing up the house. Defendant fired a shot from a gun. Defendant was using foul language as he talked to her mother. While all of this was occurring, her mother, who was blind, did nothing. Defendant began hitting her mother in the face and head. Defendant knocked her mother to the floor where he continued to hit, kick, and choke her. Defendant stepped on her mother and kicked her in the stomach. Defendant kept telling her mother to get up, but she did not. The only thing her mother said was to call 9-1-1, but the child couldn’t because defendant pulled the phone cord out of the wall.
Defendant then went into the kitchen and returned with a pot of water which he poured on her mother’s face. Her mother was not armed with a |2knife or gun; in fact, she wasn’t fighting back. The child testified that she ran to her room after the fight, and defendant “walked in and touched [her] in between [her] legs.” Defendant then told the child to get in her mother’s blue car, and they drove away from the house. He didn’t tell her where they were going but drove to the store where Greg Jones worked where defendant tried to sell his wedding ring. The child testified:
Greg Jones told him to get on with that ring. To leave.
... And then I said, hello Mr. Greg Jones.
... That was a little hello for help.
After Jones refused to take the ring, defendant got back in the car, and they drove off. Defendant accidentally drove into a ditch. Defendant told her to help him get the car out of the ditch, but she refused.
Deputy Leroy Threats with the East Carroll Parish Sheriffs Department was the first to arrive on the scene of the traffic accident. Defendant was sitting in the driver’s side seat, and a little girl was sitting on the passenger side. Deputy Threats asked defendant if everybody was all right, what occurred, and basically what had happened. Deputy Threats related that defendant stated he was trying to turn around when he landed in the ditch. Deputy Threats observed that defendant acted “jittery” and “very nervous.” Deputy Threats testified that he asked defendant about the child’s mother. He stated that she was gone to some type of church function with friends. After further conversation, Deputy Threats asked defendant to step out of the vehicle. The deputy detected a slight odor of alcohol on defendant’s breath and asked defendant whether he had been drinking. | ¡¡Defendant said he had had a beer or so. Deputy Threats had his flashlight and observed what he thought was blood on defendant’s pants leg and down by his shoes. So he asked defendant whether it was blood. Defendant stated that he had been cleaning fish earlier that day. Defendant stated that he had picked his stepdaughter up from school because his wife was at church.
*994 Sheneta Proctor, Shonda’s sister-in-law, and the child’s -aunt, was called to the scene and was permitted to take the little girl home with her. Defendant was placed under arrest for suspicion of DWI at that time.
The shift supervisor, Deputy Glen Threats, arrived on the scene and spoke with Sheneta Proctor. Deputy Glen Threats testified, “I was informed by the aunt that she had been trying to contact her sister and that she felt that something wasn’t right. Sheneta asked him to go to her sister’s home to check on her.
Deputy Glen Threats got a key from Sheneta. As he opened the door to Shon-da’s home, the first thing he observed was that the house looked “trashed,” like there had been an altercation or something in the residence. As he looked further into the home, he saw a woman’s body lying on the floor. Deputy Glen Threats found the victim lying on the floor of her home without clothing and with swelling to her face and around her eyes. He then checked for a pulse but didn’t feel one and requested that an ambulance be dispatched to the home. A torn nightgown was found in the residence.
Gregory Jones testified that he was standing on Gould Street when a car pulled up, a guy got out and tried to sell him a ring. Jones told the man |4he didn’t deal in that kind of stuff. As the man was backing out, the little girl, who he knew to be Shonda’s daughter, said, “hey, Mr. Greg.” Because he thought this was suspicious, Jones then flagged down a police officer and informed him of the incident.
Sheneta Proctor testified to her sister-in-law Shonda’s medical conditions at the time of her death. According to Sheneta, Shonda had high blood pressure and diabetes which caused her blindness in May of 2002.
Defendant and Shonda met through a mutual friend, Angela Hamilton. Defendant was incarcerated and they talked over the phone for approximately eight months before Shonda’s death. When defendant was released from prison, Sheneta drove Shonda to pick him up and then dropped them both off back at Shonda’s house. Six or seven days later, Shonda called Sheneta at work to tell her that she and defendant were getting married, and two days later, Shonda was dead.
Sheneta described defendant as inquisitive and possessive. In describing defendant’s relationship with Shonda, Sheneta testified that she and Shonda talked daily, two and three times a day. They talked constantly. During the time that Shonda and defendant were together, he answered the phone and would listen in on their conversations. The family all had keys to the house because of Shonda’s medical condition. She also told a nephew who had been staying with her to help out to leave. After defendant was released from prison, Shonda went through approximately $1,500 in less than a week. According to Sheneta, this was very uncharacteristic behavior.
IfiOnce Shonda’s body was discovered, Trooper Neal Harwell of the Louisiana State Police was called out to the scene to aid in the investigation. The body had already been taken to the hospital, as had the child, so Harwell went there first and examined the body and then spoke to the child, who told Trooper Harwell what happened. Harwell then went to the victim’s home and found it to be in “disarray” and showing signs of a fight. Trooper Harwell went to the Riverbend Detention Center to speak to Barry McCray. After advising him of his rights, the officer questioned defendant, who stated that although they had an altercation and he had hit his wife once, she was alive when he left with the *995 child. When asked more specific questions, defendant asked for a lawyer, and the interview was over.
Dr. Stephen Hayne conducted the autopsy for the state and was admitted as an expert in forensic pathology. Dr. Hayne noted that there were multiple injuries to the victim’s face, “including what are called raccoon eyes or preauricular hema-tomas, bruises also abrasions or scraping of the skin located over the forehead and to the far side of the right eye.” He also noted an abrasion or scrape located over her chin and small abrasions over the bridge of her nose. There were also contusions on the left arm and shoulder of the victim, a cut on her upper left chest, and abrasions over the upper right abdominal wall and the front of her right forearm, left wrist and left forearm. Regarding the injuries, Dr. Hayne described them as extensive and consistent with a punch or a kick.
Dr. Hayne noted that the victim sustained considerable soft tissue damage. There was obvious puffiness or swelling of the tissue indicative of |6bleeding underneath the skin surface producing the large contusions. Enough force was used to tear blood vessels and allow bleeding to occur. Finally, Dr. Hayne was questioned as to the brain injuries that could have resulted from the types of blows described. According to Dr. Hayne, various brain functions would have begun to shut down in the victim as a result of brain swelling and the bleeding into the subdural space. Dr. Hayne identified the immediate cause of death as a closed-head injury that was a product of blunt force trauma or injury caused by blows to the head.
On cross-examination, defense counsel first questioned Dr. Hayne’s credentials as an expert. He then asked Dr. Hayne whether he considered the victim’s extensive medical history in coming to his conclusions about her death. Dr. Hayne responded that the victim was diabetic and obese and had significant cardiovascular disease.
On redirect, Dr. Hayne restated his conclusions that a person like the victim would be more susceptible to dying or suffering greater impairment from these types of injuries. He emphasized, however, that in this case, death was a product of trauma; it was not a product of disease.
Joanie Wilson from the Louisiana State Police Crime Lab testified that two blood stains from a torn nightgown found in Shonda Proctor’s home, two stains from a baseball cap also found at the home, and two stains from defendant’s jeans taken from him on the night of his arrest were examined for blood and DNA. The blood on the nightgown was determined to be a mixture of two people’s, one of the stains on the jeans was found to belong to a male and the other to a female, and the blood on the cap was |Tfound to be that of the victim. Defendant could not be excluded as a donor of the blood samples found on the jeans and the nightgown, but 99% of the population could be excluded as donors. Defense counsel also attempted to question Wilson regarding a gunshot residue kit sent to the crime lab, but she was unable to testify to anything regarding the kit as that was not her department.
The state recalled Trooper Neal Harwell to testify regarding a gun found at the victim’s home. Over objection by defense counsel (and denial of a motion for mistrial filed by defendant), Trooper Harwell testified that during his interview defendant never stated that the victim fired a gun, nor was there any evidence obtained in the course of his investigation that the victim fired a gun.
At that point, defense counsel filed a motion for a judgment of acquittal as to *996 the aggravated kidnapping charge. After the motion was denied and the state rested, defendant testified as to the events of that night against the recommendation of counsel.
According to defendant, the day that Shonda Proctor died was a typical one. After picking up the child from school, defendant and Shonda had sex. A few hours later, the child knocked on their door and told her mother she had a phone call. After the call, Shonda became argumentative. The call had been from a woman who worked at Jong’s who Shonda suspected defendant of wanting to have sex with.
Defendant got dressed and went to the living room to watch television. Shonda came out of the bedroom naked and confronted him, Rarmed with a .22 pistol she got from the kitchen. Shonda fired the gun, at which time the child came running out of her room. Defendant and Shonda were “shuffling” over the gun, and he hit her three times. As Shonda fell forward, he leaned back on the couch, grabbed the gun, and threw it.
When the child saw him hit Shonda, she went back into her room. He then called for the child, told her they were leaving, and they rode around for 40 minutes or so. Because he was unfamiliar with Lake Providence, he usually took Shonda’s nephew or daughter with him. They rode around for a while, then as they were headed back home, he ended up in the ditch.
Two cars came by and as he waited for one of the drivers to come back and help, a police officer drove up. The officer asked him to take a sobriety test, and since it had been a while since he’d had a drink, he agreed. When the officer told defendant he was under arrest for DWI, defendant told them to call Shonda’s sister-in-law, Sheneta Proctor, to come “get the kid.”
According to defendant, he did not learn that Shonda was dead until the next day when two detectives took him to a room to be interviewed. They told him Shonda was dead. Then they said the little girl had given her statement, and they wanted to hear his side. He started crying, he couldn’t believe she was dead. He knew she had medical problems, but there was nothing wrong with her “for her to be dead” when he left the house.
Defendant denied all knowledge of Greg Jones and stated that he didn’t try to run or hide when Shonda came at him with a gun because: (1) he didn’t know she had the gun; (2) she was “up onto” him by that time; (3) |9she was blind; and, (4) she weighed 280 lbs. He thinks he “handled that pretty good.” When he saw she was “destined to shoot the gun,” he hit her.
According to defendant, when he left the house, Shonda was walking around, “talking crazy,” and cursing.
The final witness for the defense was Dr. Rodrigo Galvez, an expert in forensic pathology. Dr. Galvez reviewed the autopsy report and examined the photographs. Dr. Galvez stated that although Shonda Proctor had received some blows, he could not say that they were the cause of death. He opined that she could have had a stroke.
The jury returned a unanimous verdict of guilty as charged to both second degree murder and aggravated kidnapping. The defendant was sentenced on May 8, 2008, to life imprisonment at hard labor without benefit of probation, parole, or suspension for each conviction, and the trial court ordered that his sentences be served consecutively. During sentencing, the trial court justified making the sentences consecutive considering defendant’s long criminal history, total lack of remorse of either crime, total denial of responsibility for ei *997 ther crime, and “the fact that he chose to kidnap the child and use her for whatever advantage that he could find after knowing that there was no way for his wife to recover.”
Defendant now appeals.

Discussion

Sufficiency of the Evidence

In reviewing the sufficiency of the evidence to support a conviction, the reviewing court must determine if the evidence, viewed in the light most | infavorable to the prosecution, was sufficient to convince a rational trier of fact that all of the essential elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact is charged to. make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).

Second Degree Murder

Second degree murder as applicable to the present case is defined in La. R.S. 14:30.1(A)(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
The evidence presented at trial shows that defendant struck the victim multiple times with his fists; the victim is now deceased; defendant after striking the victim, left the scene in the victim’s car with the victim’s nine-year-old daughter. The disputed facts are whether the multiple blows to the victim’s head by defendant caused her death and whether defendant acted in self-defense. The testimony presented by the state shows that the victim was blind, obese, diabetic, and suffered from cardiovascular disease. The victim’s daughter testified that defendant, with no provocation from the victim, beat the victim about the head and torso, kicked and choked the victim, and poured water on her face, leaving her on the floor struggling to breathe. Defendant testified that the victim threatened him with a gun and In that he struck her to get away and that she was physically okay when he left the home. Defendant’s medical expert testified that because of her many medical problems, the victim was exceptionally susceptible to aneurysms and other brain-bleeding problems; however, he could not come to a conclusion regarding the cause of death. The state’s medical examiner testified that the victim died of a closed-head injury resulting from being struck multiple times in the head. The photographs placed into evidence showed that the victim suffered excessive head injuries.
Viewing the evidence in the light most favorable to the prosecution, it is clear from the nature and extent of the injuries sustained by the victim that the state convincingly showed the requisite intent and that the multiple blows to the head caused the victim’s death.
The remaining question is whether the state bore its burden of proving that the murder was not committed in self-defense. According to La. R.S. 14:20(A)(1), a homicide is deemed justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. *998 D.P.B., 02-1742 (La.05/20/03), 846 So.2d 753; State v. Gamer, 39,731 (La.App. 2d Cir.09/08/05), 913 So.2d 874, writ denied, 05-2567 (La.05/26/06), 930 So.2d 19.
The testimony of the victim’s child, the extent of the battering and the testimony of the possessive and controlling behavior of defendant toward h2the victim refutes his claim of self-defense. The only evidence presented of self-defense was the testimony of defendant. Not surprisingly, defendant’s testimony was entirely different from that of the victim’s daughter, whose testimony was consistent with the physical evidence. The trier of fact must determine the credibility of each witness and, if rational, that judgment must be accepted by a reviewing court. In this case, the jury obviously found defendant’s claim of self-defense incredible.
Defendant also argues that because the state did not test the victim’s hands for gunshot residue, the state failed to disprove self-defense. Even if the victim had fired the gun as claimed by defendant, it would not change the overpowering evidence of guilt. The victim was blind and would have been easily disarmed by defendant. Defendant, in a rage, beat the victim, kicked her, and poured water on her face as she laid on the floor. Any danger defendant faced had long dissipated.
This assignment of error is therefore without merit.

Sufficiency of Evidence, Aggravated Kidnapping

Aggravated kidnapping is defined in La. R.S. 14:44 as:
[t]he doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person. (Emphasis added).
| lain determining whether an aggravated kidnapping offense occurred, the crucial question is whether the defendant sought to gain an advantage or immunity, or any thing of present or prospective value by playing upon the victim’s fear and hope of eventual release. Sexual gratification is something of value. State v. Shipp, 30,562 (La.App. 2d Cir.04/08/98), 712 So.2d 230, writ denied, 98-1199 (La.09/25/98), 724 So.2d 775; State v. Overby, 30,589 (La.App. 2d Cir.04/08/98), 714 So.2d 28.
Defendant contends that there was no forcible seizing of the child and that the state failed to prove that defendant sought to receive anything of apparent present or prospective value from the victim to secure her release.
The nine-year-old child witnessed defendant beat her mother unconscious and believed her mother was dead. The child fled to her room and defendant followed. Defendant touched the child between her legs and took her outside to the car and fled the scene in the car, taking her with him. Clearly, a nine-year-old child under these circumstances felt intimidated by and forced to go with defendant. A rational juror easily would have found the element of a forcible seizing and carrying of the child away.
Defendant’s intentions with the child were thwarted by the accident and arrival of the sheriffs deputy. The child was an eyewitness to murder. Just before the *999 child was taken away, she was sexually molested by defendant. A reasonable juror could have found from these circumstances that defendant was using the child to obtain an advantage or immunity by eliminating the only witness to a murder as well as obtaining sexual gratification.
| uDenial of Mistrial/Fifth Amendment Violation
The defense argues that defendant’s Fifth Amendment right to silence was violated when the assistant district attorney asked during his case in chief the question, “Did [defendant] ever tell you that Shonda fired a gun?” and Trooper Neal Harwell responded, “No.”
The problem at issue arose following an aggressive cross-examination by defense counsel of Detective Neal Harwell concerning the failure to test for gunshot residue on the hands of the victim. On redirect, the state established that the victim’s child told the officer that defendant had fired the gun prior to the physical altercation with Shonda Proctor. On recross, defense counsel pursued the fact that if “tests had been conducted, that would be definitive to determine whether Mr. McCray was firing the gun or Miss Proctor was firing the gun, isn’t that correct?”
Thereafter, Joanie Wilson, the DNA supervisor at the Louisiana State Police Crime Lab, was called by the state to testify. Defense counsel questioned her repeatedly about a gunshot residue kit which she explained would have been handled by a different section of the crime lab.
Prior to resting, the state re-called Trooper Neal Harwell a second time and the following occurred:
[District Attorney]: ... And further, did Barry ever tell you that Shonda fired a gun?
A: No.
[District Attorney]: Did you have any evidence to indicate in the course of your investigation that Shonda fired a gun?
A: No.
115After the state rested, defendant testified, against his attorney’s advice. Defendant testified that the victim pulled a gun on him while he was seated on the couch watching television and that she fired the gun at him once and attempted to fire it twice more, but that it jammed. On cross-examination, the state inquired of the circumstances surrounding the gun several more times but never asked defendant why he did not tell law enforcement officers about the victim threatening him with a firearm.
The Fifth Amendment to the United States Constitution provides (in pertinent part): “No person shall ... be compelled in any criminal case to be a witness against himself....”
In Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S.Ct. 2240, 2244-45, 49 L.Ed.2d 91 (1976), the United States Supreme Court considered the issue of prosecutorial questioning regarding a defendant’s invocation of his right to silence. The Court held:
Silence in the wake of [Miranda ] warnings may be nothing more than the ar-restee’s exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested ... Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.
*1000 The Court went on to hold that “the use for impeachment purposes of petitioner’s silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment.”
11,In this case, after appropriate Miranda warnings, defendant voluntarily stated that he had an altercation with and hit his wife once. He further stated that she was alive when he left with the child. Only when asked more specific questions did defendant ask for a lawyer. These statements actually made before the request for a lawyer were admissible into evidence. However, defendant did exercise his Miranda rights and for the assistant district attorney to ask what defendant did not say borders on a violation of Doyle’s proscriptions.
This court considered the issue of the standard of review of an alleged Doyle violation on appeal in State v. Lee, 88,114 (La.App. 2d Cir.03/03/04), 868 So.2d 256, 264-65, writ denied, 04-1128 (La.10/08/04), 883 So.2d 1027, adopting the U.S. Supreme Court’s language from Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).
Under the rationale of Doyle, due process is violated whenever the prosecution uses for impeachment purposes a defendant’s post-Miranda silence. Doyle thus does not bear the hallmarks of a prophylactic rule.
Instead, we think Doyle error fits into the category of constitutional violations which we have characterized as “ ‘trial error.’ ” Trial error “oecur[s] during the presentation of the case to the jury,” and is amenable to harmless-error analysis because it “may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].”
When first questioned by Trooper Har-well, defendant waived his right to silence and gave a statement to the investigating officer and in that statement there was no ambiguity in his failure to mention the gun and self-defense. When asked more specific questions he requested an attorney. Defense counsel strongly cross-examined officers and argued to the jury [17that the investigation was poorly conducted and not thorough because the officers failed to conduct a gunshot residue test -and to adequately investigate who had fired the gun. In State v. Bell, 446 So.2d 1191 (La.1984), the court held that a defendant may not tell the jury that the state’s case is the result of an improper investigation without allowing the state to try to show the jury that the investigation was indeed thorough, or at least sufficiently thorough as to include inquiries of the defendant in order to get leads which might verify, or dispute, defendant’s noninvolvement. Id. at 1194.
Even if the prosecutor’s questioning on redirect of the investigating officer was improper, the question remains whether, under the harmless-error test, defendant is entitled to relief. Considering all the circumstances surrounding the question and the overwhelming evidence that defendant committed the crime of second degree murder of Shonda Proctor, the error, if any, was clearly harmless. We find that even if Shonda fired the gun, the evidence would still have allowed for no other verdict other than defendant’s guilt.
This assignment is therefore without merit.

Evidence of Other Crimes

According to defendant, the testimony by victim’s child about defendant touching her between her legs was inadmissible other crimes evidence without the state having provided notice to the defense and without the trial court having consid *1001 ered the prejudicial effect of such testimony.
In State v. Kimble, 407 So.2d 693 (La. 1981), the supreme court held that a witness can testify regarding a continuous chain of events. Further, the statement is admissible as part of the res gestae as an integral part of the act or transaction that is the subject of the proceeding. State v. George, 37,492 (La.App. 2d Cir.9/24/03), 855 So.2d 861.
Evidence of integral acts, or res gestae, is admissible under La. C.E. art. 404(B)(1) without requiring the state to give Prieur notice or the trial court conducting a Prieur hearing. State v. Boyd, 359 So.2d 931 (La.1978); State v. Mando-sia, 36,827 (La.App. 2d Cir.4/09/03), 842 So.2d 1252.
The “res gestae ” doctrine includes testimony of witnesses regarding what they heard or observed before, during, or after the commission of the crime, including utterances or declarations, if a continuous chain of events is evident under the circumstances. State v. Lowery, 33,905 (La.App. 2d Cir.2/28/01), 781 So.2d 713, writ denied, 2001-1041 (La.2/22/02), 809 So.2d 978 (internal citations omitted) (emphasis added). “The test of integral act evidence is not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inference, whatever they may be, necessary to reach an honest verdict.” State v. Gad-dis, 35,661 (La.App. 2d Cir.3/14/03), 839 So.2d 1258, writ denied, 03-1275 (La.5/15/04), 872 So.2d 519, cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487. (Emphasis in original).
State v. Grant, 41,745 (La.App. 2d Cir.04/04/07), 954 So.2d 823, 834, writ denied, 07-1193 (La.12/07/07), 969 So.2d 629.
The child testified that after defendant finished beating her mother and she had fled to her bedroom, defendant followed her there, “touched [her] between [her] legs” and then made her leave the house with him in her mother’s car. The child’s statements regarding defendant’s actions in her |19bedroom give a complete picture of the events surrounding the victim’s death and the child’s kidnapping.

Limitation on Cross-Examination

Defendant argues that the trial court’s refusal to allow defense counsel to question Dr. Hayne about the amount of money he makes as a result of performing approximately 1,500 autopsies a year was prejudicial to his client. Defendant claims that the number of autopsies performed exceed the national standards and that the fact that Dr. Hayne earned over $800,000 a year doing so would have caused the jury “to consider whether the ‘expert’ was really a hired gun who bent his professional ethics for profit.”
In State v. Tauzin, 38,436 (La.App. 2d Cir.08/18/04), 880 So.2d 157, writ denied, 04-2809 (La.06/24/05), 904 So.2d 717, this court considered a similar question to that raised here. This court stated:

Relevancy and admissibility calls are properly within the discretion of the trial judge, whose determination in these areas should not be overturned absent a clear abuse of discretion.

Id. at 163-164.
In the present case, the trial judge determined that defense counsel’s attempts to question Dr. Hayne regarding determinations by the Mississippi Supreme Court as to his credibility and questions regarding his annual income were irrelevant and *1002 inadmissible in the present proceeding. We may disagree; however, the ruling is clearly harmless error. The defense was permitted to question the witness regarding his procedures and determinations. The defense expert agreed to the thoroughness of Dr. Hayne’s autopsy procedures; however, the defense expert was not sure that 120he agreed with Dr. Hayne’s conclusions about the cause of death.
This assignment is therefore without merit.

Conclusion

For the foregoing reasons, defendant’s second degree murder and aggravated kidnapping convictions are affirmed.