803 So.2d 1057 (2001)
STATE of Louisiana, Appellee,
v.
Milton FRANKLIN, Appellant.
No. 35,268-KA.
Court of Appeal of Louisiana, Second Circuit.
December 19, 2001.
*1059 Peggy J. Sullivan, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Traci A. Moore, Tommy J. Johnson, Assistant District Attorneys, Counsel for Appellee.
Before BROWN, PEATROSS and DREW, JJ.
DREW, Judge.
Milton Franklin was convicted of aggravated rape, and sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence, from which conviction he now appeals. We affirm.

FACTS
At the time of this unfortunate incident, the victim was a female certified nursing *1060 assistant providing in-home care to invalid and handicapped patients. One of her patients was Mrs. Emma Franklin. For approximately two years, the victim had been coming to Mrs. Franklin's home to provide assistance in bathing, grooming and eating. Living with Mrs. Franklin was her son, the defendant herein.
On June 9, 1999, the victim arrived at the Franklin home in the morning. The defendant, who slept on a couch in the living room, let the victim into the home through the kitchen door. Although the victim had seen the defendant hundreds of times, they were not friends, and her visits to the home were strictly professional. The only communication between the two was regarding the care of Mrs. Franklin.
After the victim took care of Mrs. Franklin's needs, she placed her into her electric wheelchair and then prepared Mrs. Franklin some breakfast. As Mrs. Franklin was eating in the kitchen, the victim was making up her bed. At that point, the defendant came from behind her, and grabbed her in a headlock. The victim felt a knife at her throat. The knife turned out to be a "Case" butter knife. The victim noticed the smell of alcohol, as if the defendant had been drinking a long time.
Realizing that she was going to be raped, the victim tried to fight off the defendant, but he told her to quit fighting or he would kill her. He then forced the victim into another bedroom and bent her over a bed. According to the victim, the defendant forced her pants and panties down. According to the defendant's statement to the police, the victim pulled her pants down at his direction. The zipper on the victim's pants was torn. Still holding the knife to the victim's side, the defendant vaginally raped her. He did not ejaculate inside her. As a result of the rape, the victim received multiple bruises on her neck, shoulders, back, and buttocks.
As the attack was occurring, Mrs. Franklin came down the hall in her wheelchair and saw the rape. She began screaming for the defendant to stop. She was unable to use the phone because the defendant had taken it off the hook.
After the rape, and as the defendant was distracted by his screaming mother, the victim put her clothes back on and ran out the kitchen door, got into her car and drove to a nearby gas station to call and report the rape. Once in the gas station, the victim told the clerk to call the police. The clerk testified that the victim was hysterical.
When the police arrived, the victim identified the defendant as the rapist. The police took the victim to L.S.U. Medical Center where Dr. Antonio Pizarra conducted a rape exam, made a vaginal swab and noted her injuries. Later tests found a small amount of sperm on the vaginal swab. DNA testing established a one in 391 trillion chance that the sperm could have been from someone other than the defendant.
Moments after the rape, the defendant left the scene. He gave a note to a neighbor, addressed to his mother, admitting that he had done something wrong and indicating that he was going to hang himself. As the officers were at the residence preparing to begin a search for the defendant, he walked up and surrendered. He had been held by a neighbor who was concerned that the defendant might flee and commit suicide. The defendant was arrested, and one of the officers read him his Miranda rights from a card. The defendant did not request an attorney. The officers advised the defendant that he was being arrested for the sexual assault of the victim. The officers did not attempt to take a statement from the defendant at that time.
*1061 After the defendant was arrested, he signed a written consent form to search his home. The defendant took the officers to the kitchen where he showed them the "Case" butter knife that the defendant identified as the one he used. None of the arresting officers noticed any impairment of the defendant by drugs or alcohol.
About eight hours after the defendant was taken into custody, he was questioned by detectives Langford and Eatman. The defendant told the detectives he could not read. A detective first read the defendant his Miranda rights off a form and the defendant signed that portion of the form. Next, the officers read the part of the form as to whether the defendant waived those rights and agreed to give a statement. At this time the detectives did not think that the defendant appeared to be under the influence of drugs or alcohol. The earlier investigation of the defendant's home provided evidence that the defendant had been drinking and possibly using crack cocaine sometime prior to the rape. The detectives testified that the defendant was not promised anything or threatened in any way for his statement.
At the defendant's request, the waiver portion was read again. When he was asked if he understood what was said, the following colloquy occurred:
The defendant: Yea, these are privilege of my rights.
The detective: Yes.
The defendant: In this case, do I want to make a statement?
The detective: Right.
The defendant: I sign my name to this.
The detective: Yea, it just says that you understand what your rights are.
(There was then a pause, where the testimony indicates that the defendant signed the rights waiver.)
The detective: Ok, I also need for you to put today's date down there. Where it says date. It's 6/9/99.
After the defendant signed and dated the form, the detectives questioned the defendant about the rape. He initially told the detectives about how the victim would come to his mother's house five days a week. On that day he went into a rage because of an argument he had with his mother. He stated that in this rage, he grabbed the victim. He admitted having a butter knife when he grabbed the victim. He described first trying to stab his mother, then grabbing the victim, and wanting to stab her.
As the detectives began to question the defendant about the rape, he was initially reluctant to admit the facts. For example, when asked if he put his penis in the victim's vagina, the defendant first replied, "I don't remember, if she say so, I did it." When told by the detective that the victim was being examined by a doctor, the defendant next stated, "I guess I did." When told that the response was not good enough, the defendant then stated, "Ok, I did, I did."
Next, the detective asked the defendant if he said that because he thought that was what the detective wanted to hear or because it was the truth. To this, the defendant replied, "Ah, it's the truth, whatever, whatever." The defendant denied pulling off the victim's clothes, asserting that she pulled them off because he had a knife. The defendant then stated that they had sex from behind. When asked if he told the victim to pull her pants down, the defendant first responded, "I might have told her." When asked again, he stated, "Yea, I guess I did." When asked the third time, the defendant admitted to telling the victim to pull her pants down. After further questioning the defendant admitted that he was threatening the victim with the knife as he told her to pull her pants down. In further questioning, the detectives got the defendant to repeatedly *1062 admit having sex with the victim, although he would assert that it wasn't rape. The defendant did deny ever having sex with the victim prior to this incident.
The defendant was charged with aggravated rape. At the hearing on the defendant's motion to suppress held on June 29, 2000, the trial court denied the motion to suppress. At trial, the defendant testified and claimed that he did not have sex with the victim on that date, but that they had sex on prior days. Following the trial, the jury convicted the defendant of aggravated rape. The trial court sentenced defendant to life imprisonment, without benefit of probation, parole or suspension of sentence.

DISCUSSION

Applicable Law
La. R.S. 14:42 provides, in pertinent part:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
* * *
D. (1) Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Sufficiency of the Evidence
Contending that the evidence presented at trial was insufficient to convict him of aggravated rape, the defendant argued that the defendant denied the rape at trial, the state did not prove that a "dangerous weapon" was used during the commission of the rape, and that the nursing assistant originally stated that it was an "attempt" to rape her.[1] In applying the Jackson v. Virginia, 443 U.S. 307, 99 *1063 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard to the facts of this case, the first question is whether or not the state proved that the victim was raped. In light of the fact that the next assignment of error relates to suppressing the defendant's confession, this question will be largely considered in light of evidence other than the defendant's confession.
The victim testified that the defendant grabbed her from behind, put a knife to her neck and then dragged her into another bedroom. Next, she testified the defendant bent her over a bed, put the knife to her side and ripped down her pants and panties. Once her panties were down, the defendant forcibly penetrated her vagina with his penis. This act was done with such force as to cause multiple bruises on the victim's body. After the defendant completed the act, the nursing assistant was able to flee to safety, where she reported the crime. Her rape exam performed at L.S.U. Medical Center found a small trace of sperm. DNA testing identified that sperm as the defendant's, at odds of 391 trillion to one.
During his trial testimony, the defendant denied raping the nursing assistant on the date in question and asserted they had engaged in consensual sex on other days. The jury chose not to believe the defendant, and voted to convict. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App. 2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
Defendant also contended that a butter knife was not a dangerous weapon and that he was improperly convicted of aggravated rape. La. R.S. 14:2(3) defines dangerous weapon as follows:
"Dangerous weapon" includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.
The defendant argues that a butter knife held against the victim's throat "is not calculated or likely to produce death or great bodily harm." Such an argument is not supported by the jurisprudence. In State v. Underwood, 98 363 (La.App. 3d Cir.12/23/98), 724 So.2d 859, the defendant arming himself with a butter knife resulted in a guilty plea to aggravated burglary. In State v. Wooden, 572 So.2d 1156 (La. App. 1st Cir.1990), the defendant stabbed the victim to death using a butter knife. In State v. Liner, 397 So.2d 506 (La.1981), the defendant was convicted of first degree murder, and sentenced to life imprisonment, for stabbing his female victim to death with a fork and a butter knife.
In the present case, the defendant's use of a butter knife in the commission of a rape was clearly used in a manner to produce death or great bodily harm, if the victim had not complied with his demands and, therefore, constituted the use of dangerous weapon. This assignment is without merit.

Motion to Suppress Defendant's Statements
The defendant asserted that the trial court erred in denying his Motion to Suppress his statements to the law enforcement officers. Franklin argued the record does not affirmatively show that he waived his rights prior to making a statement to the police, and that the statement was induced by promises of getting him help for his mental and/or emotional problems. Further, Franklin stated that without the statements, the evidence was insufficient *1064 to support his conviction. In the state's view, the defendant affirmatively waived his rights prior to making his statements for which no threats or promises were made.
La. R.S. 15:451 states:
Before what purposes[2] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993). At a hearing on the motion, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985). Before a confession can be introduced into evidence, the state must affirmatively prove that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C.Cr.P. art. 703(D). The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Walker, 28,577 (La.App. 2d Cir.10/4/96), 681 So.2d 1023.
The admissibility of a confession is in the first instance a question for the trial judge. His conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992). This court places great weight upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Crews, 28,153 (La.App. 2d Cir.5/8/96), 674 So.2d 1082.
Here, the trial court heard the evidence in the motion to suppress, took the matter under advisement and rendered a written opinion "reluctantly denying" the motion to suppress. The trial court made the following findings of fact:
1. Detective Eatman advised defendant per Miranda by reading from a printed rights card. Defendant responded that he understood his Miranda rights. Detective Eatman then sought defendant's waiver of said rights; however, defendant stated that he did not understand the waiver of said rights. Nevertheless Detective Eatman instructed Defendant to sign his signature indicating that he understood the waiver. After which, Detective Eatman read a second time the waiver of rights instructions to defendant. Again, defendant failed to indicate that he understood the waiver of rights.
2. Before defendant was arrested and transported to the Detectives' office for questioning, Detective Eatman and other police officers observed at the scene of the offense indications that the defendant had been drinking beer and smoking crack cocaine.
3. Before defendant gave his recorded statement, Detectives Eatman and *1065 Langford had learned that defendant had written a suicide note and defendant had some mental/emotional problems. Detective Eatman testified that defendant appeared to be in need of psychological help.
The trial court further found Detective Eatman "conducted the interview of defendant in an honest, professional, skillful, and straight forth manner. No reason exists to challenge Detective Eatman's veracity and assessment of defendant's physical or mental condition at the time defendant gave his recorded statement." The trial court found that the facts regarding the defendant's intoxication or mental and/or emotional state were not enough to find the confession involuntary. The trial court held that the "defendant's comprehension was not negated and defendant was conscious of the consequences of what he was saying. Therefore, defendant's Motion to Suppress is reluctantly denied."
According to the defendant, the trial court's finding that the defendant was silent as to the waiver of his rights before giving his statement is sufficient to sustain his motion to suppress. Further, defendant complained that the trial court's ruling did not address the evidence that the defendant's confession was induced by promises of getting the defendant help.
The law is well settled that a defendant's silence cannot be presumed to be a waiver of rights. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rehearing denied, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), the United States Supreme Court declared that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he has the right to remain silent and to consult with an attorney. Miranda also made it clear that for such a statement to be admissible it must be made with a knowing and intelligent waiver of those rights. Miranda, supra.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Furthermore, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). The waiver of Miranda rights need not be explicit and may be inferred from the circumstances surrounding the statement. However, a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that an inculpatory statement was eventually obtained. State v. Fowlkes, 25,870 (La.App. 2d Cir.3/30/94), 634 So.2d 953.
In the present case, a careful review of the interrogation, together with other evidence in the record, supports the trial court's ruling that the statement was voluntary. When the defendant was arrested he was read his Miranda rights, and afterwards, signed a consent to search form. He then led the officers to the butter knife in the kitchen sink. Approximately eight hours later the two detectives brought the defendant to their office for questioning. The detective read the defendant his Miranda rights from a form. The defendant stated that he understood those rights, and signed that side of the form. Next, the detective read the back of the form where defendant waived those rights and agreed to give a statement. When that was read, the defendant initially hesitated in signing. At that point, the detective asked the defendant if he wanted *1066 it read again. The defendant stated, "yea." After the waiver of rights form was read a second time, the defendant stated that he understood "these are the privilege of my rights" and then indicated that he understood the reason for that part of the form was if he wanted to make a statement. After the detective said "right" to the defendant's statement about his rights, the defendant then indicated that he understood that he needed to sign the form. He signed the form. The record shows that the defendant was advised of his rights several times. The record also shows that the defendant was not silent in the waiver of his rights. The defendant engaged in a conversation with the detective in which he made certain as to the purpose of the form before he signed it. The record does not show, and the defendant did not ever testify, that there was any undue influence or threats in getting him to sign the form.
Next, the defendant argues that although the trial court did not address the issue of promises made, the defendant's statement should be suppressed because it was encouraged by the detectives offering the defendant "help" apparently for his possible mental or emotional problems. Later on in the interrogation, the defendant stated he needed help, and the detective stated that he could be helped if he told the truth.
In State v. Jackson, 381 So.2d 485 (La.1980), and in State v. Morvant, 384 So.2d 765 (La.1980), the Louisiana Supreme Court stated the principles under which the admissibility of a confession must be judged. The court first noted that as a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. Bram v. U.S., 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Louisiana, the statutorily mandated test for voluntariness is not whether a confession was induced by improper external forces but whether the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451. State v. Jackson, supra.
The defendant asserts that, but for the offers of "help", he would not have given a statement to the police. The record belies this claim. A careful review of the transcript of the interrogation and the testimony of the defendant and the two detectives does not show that the defendant was promised any specific kind of "help" or benefit prior to beginning the confession. The jurisprudence on this issue has repeatedly concluded that a remark by the police telling the defendant that the officer will "help" or "do what he can or things will go easier" will not negate the voluntary nature of the confession. State v. Roddy, 33,112 (La.App. 2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288; State v. English, 582 So.2d 1358 (La.App. 2d Cir.1991), writ denied, 584 So.2d 1172 (La.1991).
In State v. Matthews, 26,550 (La.App. 2d Cir.12/21/94), 649 So.2d 1022, 1027, writ denied, 95-0435 (La.6/16/95), 655 So.2d 341, this court stated:
A confession obtained by direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. However, a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," does not negate the voluntary nature of the confession. (Citations omitted.)

See also, State v. Thomas, 30,490 (La. App. 2d Cir.4/8/98), 711 So.2d 808, writ denied, 99-0331 (La.7/2/99), 747 So.2d 8; *1067 State v. Taylor, 30,310 (La.App. 2d Cir.2/25/98), 709 So.2d 883.
Considering the consistent testimony of the two law enforcement officers and the transcript of the defendant's statement, the trial court did not err in finding that the statement was freely and voluntarily given after the defendant was advised of his constitutional rights. The defendant offered no testimony or evidence at the suppression hearing. The defendant's allegation that he was induced to confess by promises of "help" is unsupported by the record.
But, even if the confession was improperly allowed into trial, any error was harmless. The erroneous admission of a confession is a trial error which is subject to the harmless error analysis. State v. Tart, 93-0772 (La.02/09/96), 672 So.2d 116, U.S. cert. denied. This court has both the authority and the obligation to review the record de novo to determine an error's harmfulness. State v. Smith, 600 So.2d 1319 (La.1992). The determination begins with the premise that the other lawfully admitted evidence is sufficient to support the jury's verdict. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). The reviewing court must decide whether the error contributed to the verdict or whether the force of the evidence presumably considered by the jury in accordance with the instructions of the court is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the error. State v. Talley, 98-0282 (La.App. 4th Cir.11/17/99), 748 So.2d 1184, writ denied, XXXX-XXXX (La.1/26/01), 781 So.2d 1255.
The victim of the rape testified that the defendant put a knife to her neck, dragged her into another bedroom, ripped down her pants and raped her. The defendant threatened to kill her if she resisted. The defendant's semen was found in her vagina. The rape was committed with such force as to cause multiple bruises. The state's evidence, excluding the confession, clearly shows that the defendant committed aggravated rape. Viewing this evidence in a light most favorable to the prosecution, this court easily concludes that any rational trier of fact could have, without the confession, found beyond a reasonable doubt, that the defendant was guilty of aggravated rape. Thus, this assignment of error is also without merit.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.

The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra.
[2] Should be "purports." The Supreme Court, in quoting the section, has, at least twice, inserted "[purports]" following "purposes." See State v. Joseph, 217 La. 175, 46 So.2d 118 (1950); State v. Lanthier, 201 La. 844, 10 So.2d 638 (1943).