Judgment rendered January 15, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,122-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JOSHUA DARELLE LEWIS                        Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 93374

Honorable Mike Nerren, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Holli Herrle-Castillo

J. SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

JOHN M. LAWRENCE
HUGO HOLLAND
Assistant District Attorneys

* * * * *

Before MOORE, GARRETT, and COX, JJ.

**GARRETT, J.**

The defendant, Joshua Darelle Lewis, was convicted by a unanimous jury of second degree murder and sentenced to life in prison at hard labor, with the possibility of parole.[1] He appealed his conviction, claiming that the trial court erred in failing to grant the motion to suppress his statement to law enforcement officers. For the following reasons, we affirm the conviction and sentence.

## FACTS

On the evening of November 27, 2017, the 17-year-old victim in this case, Jaylen Thomas, was shot to death in the parking lot of the Harrison Chapel Baptist Church in Springhill, Louisiana. Thomas was shot eight times, predominantly on the left side of the body. There were two wounds to the upper arm; one entered the body cavity and exited. There were four wounds to the flank or back and one graze-wound to the upper left back. There was one wound to the right thigh, which entered the back. The bullets struck multiple structures, including the lungs, liver, spleen, and gastrointestinal tract, causing a large amount of internal bleeding. Any of the bullets which entered the body cavity could have resulted in Thomas's death. The angle of the wounds indicated that the shots were inflicted while Thomas was running away or lying on the ground. A toxicology report showed no drugs or alcohol in Thomas's system.

A cell phone was found by Thomas's right shoulder. Law enforcement officers recovered 14 shell casings from a .45 caliber weapon

---

[1] Because Lewis was a minor when the offense was committed, parole eligibility was allowed in his sentence by the trial court, pursuant to *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

and two unfired rounds. Evidence at trial showed that the bullets were fired from two different weapons. One of the weapons was "Glock-like." Two bullets were fired from one weapon and 12 were fired from the other.

The investigation by law enforcement officers soon centered on Lewis as the perpetrator of Thomas's murder. At the time, Lewis was 17 years old. He turned 18 less than two months later. His date of birth is January 14, 2000. Lewis and Thomas were students at North Webster High School. Lewis's best friend was KJ, a 14-year-old boy who was very small.[2] KJ had a disagreement with another boy, Sayon Green, over a girl. It was decided that Lewis would fight Green on behalf of KJ. Green then enlisted Thomas as his surrogate in the fight. At some point on the afternoon of the murder, Thomas called Lewis about the fight.

Thomas worked at the Sonic restaurant in Springhill. On the evening of the murder, while on a break from work at approximately 7:00 p.m., a coworker, Savannah Courtney, gave Thomas a ride to an apartment complex close to the scene of the murder. Thomas went there to talk to his girlfriend. Video from the apartment complex showed Thomas's arrival. Thomas was a member of the football team and was recovering from a broken leg sustained while playing football. As a result of the injury, he walked with a limp. He was seen talking with a female in the parking lot and then walking away.

After dropping Thomas off at the apartment complex, Courtney went to get gas for her car. She is seen on video surveillance at the gas station.

_____

[2] Although it is not clear from the record, the defendant's brief states that KJ was also prosecuted in connection with this offense. Because the record indicates that KJ is only 14 years old, his initials are used out of an abundance of caution, in accordance with La. Ch. C. art. 412.

2

The video also shows a white Nissan car drive by the gas station. The car was later determined to be driven by Lewis. The car was also observed at about the same time on video from a school close to the scene of the murder. Courtney heard several gunshots, but did not think much of it at the time. When she did not hear from Thomas, who did not answer his cell phone or come to the pickup point, she returned to work. Courtney found out later that evening that Thomas had been killed and his body had been found in the church parking lot.

A man who lived near the church stated that, on the night of the murder, he heard gunshots ring out. He was not sure of the time, but said that it was after dark. He looked out his window and saw a slender male getting into the driver's seat of a white car and leave. He did not call the police about the gunshots, but he went to check on his neighbor. When he returned to his house, a crowd was gathering and the road had been "taped" off.

When Lewis was developed as a suspect in this case, on November 29, 2017, his mother was contacted by law enforcement officers. She was asked to bring Lewis to the sheriff's office in Minden, Louisiana. Lewis arrived with his mother and sister around noon. They claimed that law enforcement officers did not begin interviewing Lewis until 4:00 p.m. and they were not aware that he was a suspect.

During the interview, which lasted one hour and 41 minutes, Lewis eventually confessed to shooting Thomas. The entire interview was recorded on video. The interview was conducted by Springhill Chief of Police Will Lynd, Detective Charlie Frazier of the Springhill Police Department, and State Trooper Rod Johnson. It was determined that Lewis

was in the 12th grade, was able to read and write, was not under the influence of drugs and alcohol, and was not pressured to make a statement. He denied having any mental conditions or disorders. The officers read the *Miranda* rights to Lewis, who said he understood his rights and was willing to waive them and answer questions. The rights form was executed by Lewis in the presence of Trooper Johnson and Detective Frazier.

Lewis detailed the plan that he and Thomas would fight each other representing KJ and Green. He stated that Thomas called him on the afternoon of the murder about the fight. Lewis, who lived in Cotton Valley, Louisiana, initially denied being in Springhill on the night of the murder. Lewis gave his cell phone to the officers, gave them the code to unlock it, and they read a text message from KJ, after the murder, expressing concern about whether there were video surveillance cameras in the church parking lot. Lewis had replied, "They would have come and got us already." Lewis then stated that he got bullets and gave them to KJ. At one point, Lewis said that he got a gun from a man in Sarepta, Louisiana. He said that KJ also had a gun. Lewis thought that both of the guns were Glocks. He later admitted that he and KJ were in Springhill on the night of the murder and were in the church parking lot. He said he heard Thomas, so he got out of his car, which was parked by the cemetery fence. Lewis said that Thomas said something to them and reached for his cell phone. Lewis thought that Thomas was calling for others to come and jump them. Lewis said he shot at Thomas once and KJ fired at the victim twice. Later, Lewis said that KJ fired five or six times. During the shooting, Thomas was ducking, dodging, and running before he fell to the ground. When Thomas fell, Lewis fired the remainder of his bullets into the victim. Lewis stated that the gun jammed once during

4

the shooting. Lewis and KJ then got into the car, put on some music, and drove back to Cotton Valley. When asked why he fired all of his bullets into the victim, Lewis said, "I heard that attempted murder was worse than actually killing somebody because they would think that you are going to come back and do something else like that. You're going to do something to somebody else." When asked why he did not initially admit the killing, Lewis responded, "Because I felt like we were going to get away with it." He said, "Because I ain't thinking about no cameras or nothing."[3] Lewis also said he emptied the bullets into the victim to get rid of the bullets. Lewis did not know whether Thomas was armed. After the shooting, Lewis said that he gave his gun to a man named "Ty." The weapon was never recovered.

On January 22, 2018, Lewis was charged by grand jury indictment with the second degree murder of Thomas. He filed a motion to suppress his confession, arguing that he was 17 years old at the time of the interview and was interrogated without the presence of a family member. He claimed that his sister's request that he be allowed to consult with a lawyer before answering questions was denied, he was not initially told that he was a suspect, he was held for three or four hours before the interrogation, and was questioned for an extended period of time before making incriminating statements. Lewis also argued he was told that the detectives would talk to the district attorney to try to secure a more lenient sentence if he cooperated.

After a hearing, the trial court denied the motion to suppress. Extensive written reasons for the ruling were filed on September 25, 2018.

---

[3] At trial, law enforcement officers stated that there were no video surveillance cameras at the church parking lot.

5

The trial court found that, because Lewis was 17 years old, under the law, he was treated as an adult and was not entitled to have a family member present during questioning. The trial court found that Lewis had to personally invoke his right to counsel, which he did not do, and no undue promises were made to induce a confession. Lewis filed an application for supervisory writs to this court. On November 15, 2018, the writ application was denied on the showing made.[4]

Lewis was tried in January 2019. He was found guilty as charged by a unanimous jury. Motions for new trial and post verdict judgment of acquittal were denied by the trial court. On April 8, 2019, Lewis was sentenced to life in prison at hard labor, with eligibility for parole. Lewis appealed.

## MOTION TO SUPPRESS

On appeal, Lewis argues only that the trial court erred in failing to grant his motion to suppress his statement to law enforcement officers. He contends that the state failed to prove that the confession was free and voluntary, and the trial court failed to consider Lewis's age as a factor in reviewing the totality of the circumstances surrounding the police interrogation. These arguments are without merit.

### Legal Principles

Regarding entitlement to juvenile procedures in criminal matters, La. Const. art. V, § 19 provides in part:

> The determination of guilt or innocence, the detention, and the custody of *a person who is alleged to have committed a crime prior to his seventeenth birthday* shall be pursuant to special

---

[4] *See State v. Lewis*, 52,590-KW (La. App. 2 Cir. 11/15/18).

6

juvenile procedures which shall be provided by law. [Emphasis supplied.]

La. Ch. C. art. 804(1)(a) states:

(1)(a) "Child" means any person under the age of twenty-one, including an emancipated minor, who commits a delinquent act before attaining seventeen years of age.

When a defendant has reached the age of 17 at the time he commits an offense, he is not entitled to special juvenile procedures. *See State v. Morris*, 38,928 (La. App. 2 Cir. 9/22/04), 882 So. 2d 1221. *See also State v. Edwards*, 406 So. 2d 1331 (La. 1981); *State v. Simmons*, 381 So. 2d 803 (La. 1980); *State v. Moseley*, 587 So. 2d 46 (La. App. 2 Cir. 1991), *writ denied,* 589 So. 2d 1066 (La. 1991); *State v. Sanders*, 463 So. 2d 1022 (La. App. 3 Cir. 1985).

Regarding motions to suppress, La. C. Cr. P. art. 703 provides in part:

B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.

 . . . .

D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.

 . . . .

F. A ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial. Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress.

G. When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of

7

enabling the jury to determine the weight to be given the confession or statement.

A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.

Before a confession can be introduced in evidence, the state must affirmatively show that the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; *State v. Sparks*, 1988-0017 (La. 5/11/11), 68 So. 3d 435, *cert. denied*, 566 U.S. 908, 132 S. Ct. 1794, 182 L. Ed. 2d 621 (2012); *State v. Cousan*, 94-2503 (La. 11/25/96), 684 So. 2d 382. *See also State v. Tart*, 93-0772 (La. 2/9/96), 672 So. 2d 116, *cert. denied*, 519 U.S. 934, 117 S. Ct. 310, 136 L. Ed. 2d 227 (1996).

The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his *Miranda* rights and that he understood and knowingly waived those rights. *See State v. Glenn*, 49,705 (La. App. 2 Cir. 2/26/15), 162 So. 3d 525; *State v. Van Nortrick*, 51,604 (La. App. 2 Cir. 1/10/18), 244 So. 3d 810, *writ denied*, 2018-0194 (La. 11/14/18), 256 So. 3d 284; *cert. denied*, ___ U.S. ___, 139 S. Ct. 1185, 203 L. Ed. 2d 219 (2019); *State v. Garner*, 52,047 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1152, *writ denied*, 2018-1290 (La. 2/25/19), 266 So. 3d 288; *State v. Franklin*, 35,268 (La. App. 2 Cir. 12/19/01), 803 So. 2d 1057, *writ denied*, 2002-0352 (La. 2/7/03), 836 So. 2d 85; *State v. Horn*, 45,706 (La. App. 2 Cir. 11/3/10), 55 So. 3d 100, *writ denied*, 2010-2721 (La. 5/6/11), 62 So. 3d 124. *Miranda* warnings must inform the person in custody that he has the right to remain silent, that any statement he does make may be used

as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *State v. Odums*, 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, *writ denied*, 2017-0296 (La. 11/13/17), 229 So. 3d 924.

An accused must unambiguously request counsel sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney in order to cease custodial interrogation. *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *State v. Odums*, *supra*.[5]

A confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. *State v. Morvant*, 384 So. 2d 765 (La. 1980). However, a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession. *State v. Blank*, 2004-0204 (La. 4/11/07), 955 So. 2d 90, *cert. denied*, 552 U.S. 994, 128 S. Ct. 494, 169 L. Ed. 2d 346 (2007); *State v. English*, 582 So. 2d 1358 (La. App. 2 Cir. 1991), *writ denied*, 584 So. 2d 1172 (La. 1991). Statements of this sort are not considered improper promises or inducements because they are more likely musings not much beyond what this defendant might well have concluded for himself. *State v. Wright*, 42,956 (La. App. 2 Cir. 3/5/08), 978 So. 2d 1062, *writ denied*, 2008-0819 (La. 10/31/08), 994 So. 2d

---

[5] See *State v. Cooper*, 36,830 (La. App. 2 Cir. 3/5/03), 839 So. 2d 995, *writ denied*, 2003-0999 (La. 10/10/03), 855 So. 2d 330, noting that a statement by the defendant's father that they might want to consult with an attorney was not sufficient to invoke the defendant's right to counsel, and *State v. French*, 11-576 (La. App. 5 Cir. 11/29/11), 79 So. 3d 1155, finding that an adult defendant's father did not have standing to invoke the defendant's right to counsel.

532; *State v. Demming*, 40,033 (La. App. 2 Cir. 9/21/05), 911 So. 2d 894. Any inducement is merely one factor in the analysis. *See State v. Holmes*, 2006-2988 (La. 12/2/08), 5 So. 3d 42, *cert. denied*, 558 U.S. 932, 130 S. Ct. 70, 175 L. Ed. 2d 233 (2009). The question in each case is whether, under the particular facts and circumstances, the defendant's will was overborne at the time he confessed. *State v. Turner*, 2016-1841 (La. 12/5/18), 263 So. 3d 337.

The test of voluntariness is whether the confession was the product of an essentially free and unconstrained choice by its maker. Voluntariness is assessed on a case by case basis under a totality of the circumstances standard. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Manning*, 03-1982 (La. 10/19/04), 885 So. 2d 1044, *cert denied*, 544 U.S. 967, 125 S. Ct. 1745, 161 L. Ed. 2d 612 (2005); *State v. Sparks*, *supra*. In addition to age, some factors that have been considered in assessing the totality of the circumstances include the accused's experience, education, background, intelligence and capacity to understand the warning given at the time of the waiver. *State v. Fernandez*, 96-2719 (La. 4/14/98), 712 So. 2d 485; *State v. Terrick*, 03-515 (La. App. 5 Cir. 9/30/03), 857 So. 2d 1153, *writ denied*, 2003-3272 (La. 3/26/04), 871 So. 2d 346.

The trial court's conclusions on the credibility and weight of the testimony relating to the voluntary nature of a confession are accorded great weight and will not be disturbed unless clearly unsupported by the evidence. *State v. Hunt*, 09-1589 (La. 12/1/09), 25 So. 3d 746; *State v. Cousan*, *supra*; *State v. Sparks*, *supra*. Testimony of the interviewing police officer alone

may be sufficient to prove that the statement was given freely and voluntarily. *State v. Garner*, *supra*.

In reviewing the correctness of a trial court's ruling on a motion to suppress a statement, a reviewing court is not limited to the evidence adduced at the suppression hearing, but may consider all pertinent evidence adduced at trial. *State v. Sparks*, *supra*.

**Discussion**

In the motion to suppress, Lewis claimed that he was summoned to the sheriff's office for questioning, but was not told that he was the focus of the investigation. He stated that he waited for four hours and was questioned for almost two hours before he gave incriminating statements. Lewis argues that his mother should have been allowed to be present during the questioning and that law enforcement officers failed to recognize his family's attempts to stop the questioning in order to secure counsel for him. Lewis asserts that law enforcement officers promised favorable treatment in exchange for his statement and that his will was overborne by the totality of the circumstances. These arguments are not supported by the record.

Prior to the interview by law enforcement officers, Lewis was read his *Miranda* rights and indicated that he understood those rights. He acknowledged that no threats, promises, or pressure was used to cause him to give up his rights and answer questions. He signed a form indicating that he had been informed of his rights and willingly agreed to answer questions about the murder. This explanation of rights form, bearing Lewis's signature, was introduced into evidence at the hearing on the motion to suppress. Also introduced into evidence was a video recording of the entire interview and a transcript of the video, in which Lewis admitted that he shot

11

and killed Thomas. These items were reviewed by the trial court, which also heard testimony at the hearing from Trooper Johnson, Lewis's mother, and his sister. Lewis did not testify at the hearing or at trial.

At the hearing on the motion to suppress, Lewis's mother testified that she asked to be present during questioning, but her request was denied. Trooper Johnson participated in the interview and testified that he was not aware of any request by the family to be present during the interview, but that would not have been allowed because Lewis was 17 years old. In fact, he was less than two months from his 18th birthday. He was a senior in high school. He could read and write and had no mental conditions or disorders. Although still a minor, under the law, Lewis was not a child entitled to special juvenile procedures. Therefore, he was not entitled to have a parent present during his questioning. Under *State v. Fernandez*, *supra*, which overruled *State in Interest of Dino*, 359 So. 2d 586 (La. 1978), even if Lewis had been a child, the failure to allow a parent or counsel to be present during questioning would not have automatically rendered any incriminating statement inadmissible. Whether the statement was made freely and voluntarily would be reviewed under the totality of the circumstances, the same standard employed for adult statements.

Regarding the invocation of the right to counsel, Lewis's sister testified that she tried to stop the interview and told law enforcement officers that the family wanted to get a lawyer for Lewis. She claims that she was escorted out of the room. Trooper Johnson also said that he was not aware of any request by the family to invoke Lewis's right to counsel. No family member had standing to invoke the right to counsel on behalf of Lewis. He was fully informed of the right to counsel, stated that he understood it,

12

waived it, and voluntarily discussed the offense with law enforcement officers.

The record does not support Lewis's argument that law enforcement officers improperly promised favorable treatment in exchange for his statement. We have reviewed the video in its entirety and agree with the conclusions reached by the trial court. Lewis was fully aware of the questions being asked and the gravity of the situation. During much of the interview, his answers were evasive and untruthful. His demeanor indicated that he was not intimidated by the interview. Law enforcement officers conducting the interview did not make inappropriate promises or inducements for Lewis to make a statement, but merely implored him to tell the truth. During one portion of the interview, Chief Lynd said:

> So once again, it's time to tell the truth, put the BS behind us, 'cause we already know the truth. He's already asked questions to you that he already knew the answers to, wanted to see if you lied. And from what I'm listening to, you stink pretty bad 'cause you lie bad. You shot that boy. I don't know why you did it. I come in here to listen to it so hopefully, on the day of sentencing I can stand up and say, "Your Honor, he showed mercy, he showed regret; I'm asking the court at this point in time to show mercy on him and not throw this young man away, not ruin the rest of his life." Now, once again, put the BS behind you. Tell me the story and tell me the truth.

A little later in the interview, Chief Lynd made the following statement:

> I've got you at the crime scene where this dead body is at. And you say I don't know nothing about it. That's the lie you want to stick to. I don't know anything about it, no remorse, no mercy, nothing. That's where you want to stand? 'Cause I'm fixing to get up and walk out and these are great officers. But you know a Sheriff or a Chief or somebody that carries a little bit more weight with the D.A.? So you really want to play that role?

Shortly thereafter, Chief Lynd said:

Use your head for more than a damn hat rack and think about what I said and tell us the truth. That ain't the truth. Tell the truth. The only thing – tell the truth and let me help you. Right now, I cannot help you until I hear the truth of what we already know. But we have to hear it come out of your mouth.

At another point, when Lewis was being evasive, Chief Lynd said:

Man, get this off your chest. Tell the truth. Tell the truth. You want to tell the truth. I see it right there. You want to tell it. Get it off your chest, make it right with the Lord and tell the truth. We know the truth, I've already explained all this to you. I'm not going to go over this again. We know the truth, but to give you any help, we have to hear it.

Later, Chief Lynd said:

Tell us the truth. . . . Don't be scared. I'll hold your hand through this whole thing. I'm willing to help you. But before I can hold your hand you gotta be a man and tell the truth. Be a man. Get it off your chest. Let's go.

Lewis then admitted that he killed Thomas and gave information about how the offense occurred.

These exchanges show that the law enforcement officers conducting the interview simply made mild exhortations for Lewis to tell the truth and if he would do so, they would try to help. Such statements are permissible under our law. Lewis argues that what might be construed by an adult as encouragement to tell the truth would constitute a false promise and impermissible inducement for a 17-year-old. This argument is not supported by the record. The facts and circumstances presented here do not show that Lewis's will was overborne at the time he confessed. Lewis had been untruthful in his earlier statements regarding the murder, his demeanor and conduct during the interview demonstrated that he was not intimidated by the interrogation, and his decision to finally tell the truth was the product of his free and unconstrained choice.

14

Lewis also argues that, in denying the motion to suppress, the trial court did not consider that the defendant was 17 years old. To the contrary, the trial court was fully aware of Lewis's age at the time of the commission of this offense and when he gave his incriminating statement to law enforcement officers. As discussed above, Lewis was not classified as a child and was not entitled to any special juvenile procedures. Considering the totality of the circumstances, the record fully supports the trial court's finding that Lewis's statement was knowingly and voluntarily made and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. Lewis's decision to waive his rights, talk to law enforcement officers, and make a confession in this matter was his own decision, made freely and voluntarily. His arguments to the contrary are without merit.

### ERROR PATENT

In reviewing the record for error patent, we note that the trial court failed to observe the sentencing delays under La. C. Cr. P. art. 873, which provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

Lewis was convicted in January 2019, and, in March 2019, he filed motions for new trial and post verdict judgment of acquittal. He appeared before the court for sentencing on April 8, 2019. At that time, the motions were denied and the court immediately held a sentencing hearing and imposed sentence. Lewis did not object to the failure to observe the 24-hour

15

sentencing delay after the denial of the motion for new trial and there is no showing of prejudice. Therefore, the trial court's failure to observe the sentencing delay was harmless error. *See State v. White*, 404 So. 2d 1202 (La. 1981); *State v. Haynes*, 52,331 (La. App. 2 Cir. 11/14/18), 260 So. 3d 738, *writ denied*, 2018-2081 (La. 6/3/19), 272 So. 3d 542; *State v. Burch*, 52,247 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1190; *State v. Harrell*, 51,966 (La. App. 2 Cir. 4/11/18), 247 So. 3d 1030; *State v. Carroll*, 52,484 (La. App. 2 Cir. 2/27/19), 266 So. 3d 499.

## CONCLUSION

For the reasons stated above, we affirm the conviction and sentence of the defendant, Joshua Darelle Lewis.

**AFFIRMED.**